IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GARY LEE MCKINNEY, JR., | ) | Case No. 1:25-cv-02359-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Gary Lee McKinney Jr. ("McKinney"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying McKinney's application for DIB be affirmed.

## II. Procedural History

McKinney filed for DIB on July 10, 2023, alleging a disability onset date of December 16, 2022. (Tr. 74). The claims were denied initially and on reconsideration. (Tr. 88, 101). He then requested a hearing before an ALJ. (Tr. 118-19). McKinney (represented by counsel) and a vocational expert ("VE") testified before the ALJ on September 23, 2024. (Tr. 35-72). On

October 23, 2024, the ALJ issued a written decision finding McKinney not disabled. (Tr. 14-34). The Appeals Council denied his request for review on September 3, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). McKinney timely filed this action on November 3, 2025. (ECF Doc. 1). He asserts the following:

I. The ALJ erred by failing to draw a logical bridge between the evidence and the rejection of many disabling mental limitations related to supervision, learning new tasks, and interaction proposed by the medical opinion evidence.

II. The ALJ erred by failing to draw a logical bridge between Plaintiff's RFC and the evidence and instead based Plaintiff's RFC on her own lay opinion.

(ECF Doc. 13, p. 1).[1]

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

McKinney was 42 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 28). He has a limited education. (*See id.*). In the past, he worked in assembler production, DOT 706.687-010, SVP 2, classified as light physical demand, but performed at heavy. (*Id.*).

### B. Relevant Medical Evidence

McKinney underwent psychotherapy treatments for major depressive disorder and relationship counseling with Affinity Healthworks from October 2022 to October 2023. (Tr. 562-627). McKinney received counseling at these appointments and was not prescribed medication. (*Id.*). At the initial appointment on October 3, 2022, McKinney presented with depressive symptoms. (Tr. 562-63). At his counseling sessions, McKinney reported trauma from a history of abuse from his primary caregivers as a child, that he avoids others, and has frequent outbursts of

[1] On May 14, 2026, McKinney filed an Amended Brief on the Merits, to comply with this District's Local Rule 16.3.1. (*See* ECF Doc. 13-1). Accordingly, I cite to the Amended Brief in this Report and Recommendation.

anger and compulsivity. (Tr. 562-627). Upon mental examinations, William McComb, LSW, LCDC III, noted intact memory, excellent judgment/impulse control, good attention/concentration, and unremarkable thought process throughout his psychotherapy appointments. (*Id*.). Throughout counseling, these findings stayed consistent, with little to no variation. (Tr. 565, 567, 569, 571, 574, 576, 578, 580, 582, 585, 587, 589, 591, 593, 595, 597, 599, 601, 603, 605, 607, 609, 611, 613, 615, 617, 619, 621, 623, 625, 627, 632). McKinney's objectives were set as attending sessions, speaking openly and honestly, and examining his coping skills. (Tr. 562-63.). Throughout his counseling, these goals remained the same, with McKinney either being assessed as "progressing" or "maintained." (Tr. 565, 567, 569, 571, 574, 576, 578, 580, 582, 585, 587, 589, 591, 593, 595, 597, 599, 601, 603, 605, 607, 609, 611, 613, 615, 617, 619, 621, 623, 625, 627, 632). In an April 25, 2023 note, Counselor McComb confirmed that McKinney attends psychotherapy appointments weekly, participates earnestly in the appointments, and has severe mental and physical health concerns. (Tr. 628).

In a December 8, 2022, office visit with Marion Area Physicians Podiatry, McKinney complained of bilateral foot pain, pain in his left great toe joint, and that his foot or toe turns black and blue. (Tr. 473). At this visit, William Springer, DPM, noted McKinney had a gout attack which rendered McKinney unable to walk. (*Id.*). On examination, Dr. Springer, found no musculoskeletal defects and no acute swollen joints in his feet. (Tr. 475). Dr. Springer's impression was that McKinney had an early stage of gout and anti-inflammatory medicine was necessary. (*Id.*). Dr. Springer prescribed colchicine for the gout attacks, an anti-inflammatory medicine. (*Id.*).

From January 2023 to June 2024, McKinney was seen by Marion Area Physicians Pulmonary for excessive daytime sleepiness and obstructed sleep apnea. (Tr. 487, 498, 503, 654,

682, 711, 737). In a January 6, 2023 visit, Hiten Girishkumar Shah, M.D., noted that McKinney had a past medical history of obesity and a high score on a sleep apnea questionnaire. (Tr. 487). Dr. Shah ordered a sleep study. (Tr. 493). Based on the results of the sleep study, Dr. Shah started CPAP treatment for McKinney. (Tr. 498, 504). During an August 7, 2023, follow up, McKinney reported initial difficulty in using the CPAP due to anxiety and humidification issues and that he was only using it for an average of one hour each night. (Tr. 738). Dr. Shah counseled on proper use of at least four hours each night. (*Id.*). McKinney expressed understanding and wished to continue using the CPAP. (*Id.*).

On February 2, 2023, McKinney attended an office visit with Center Street Community Health Center where he reported low back pain. (Tr. 510). Sarah Rice, CNP, ordered x-rays and recommended alternating heat and ice, stretching, and exercise. (Tr. 515). X-rays of the lumbar spine obtained the next day revealed minimal degenerative changes with minimal degenerative spondylosis and mild disc space narrowing at L5-S1. (Tr. 530-31). In a June 14, 2023, office visit, NP Rice trialed McKinney on Zoloft at 25 mg per day, and advised him to continue therapy. (Tr. 523, 525). In an August 8, 2023, office visit, McKinney reported that he did not notice a change in his anxiety, and NP Rice recommended to continue taking Zoloft and increased the dosage to 50 mg per day. (Tr. 528).

At an August 31, 2023, follow up visit with Dr. Shah, McKinney reported noncompliance with using the CPAP and that he returned the machine. (Tr. 683). However, at this visit, he requested to start using the CPAP again. (*Id.*). Dr. Shah provided a new CPAP and advised him to use it for at least five hours per night. (Tr. 683-84).

At a September 13, 2023, office visit with Center Street Community Health Center, McKinney reported that he did not notice a change in his anxiety. (Tr. 538). Joshua Shuh, D.O.,

increased McKinney's dosage of Zoloft to 100 mg per day. (*Id.*). On October 13, 2023, McKinney reported in an office visit that the medication had "helped him a lot," and his anxiety was controlled. (Tr. 629, 631). However, during a visit on March 27, 2024, with Suzanne Schuler, M.D, McKinney stated that the Zoloft was no longer working at the original dose and stated he had been depressed his whole life, suffered from childhood trauma, and always had difficulty learning. (Tr. 767-68). As a result, Dr. Schuler increased the dosage of Zoloft to 150 mg per day. (Tr. 770).

At an April 24, 2024, office visit with Dr. Shah, McKinney reported using the CPAP for an average of three hours per night and denied daytime sleepiness when using the CPAP. (Tr. 655). On the same day, McKinney attended a follow up visit at Center Street Community Health Center for his anxiety and back pain with Dr. Schuler. (Tr. 772-77). McKinney reported that he no longer felt the Zoloft was working, even with the increase in dosage. (Tr. 774). He also reported pain radiating down his left leg. (Tr. 772). On examination, Dr. Schuler noted mild tenderness to palpation in the lower back, 5/5 strength in his legs, and depressed mood and affect. (Tr. 775). Dr. Schuler ordered physical therapy to address the back pain, discontinued Zoloft after tapering, and started Cymbalta 30 mg. (Tr. 775-76).

At a July 25, 2024, office visit with Dr. Schuler, McKinney reported he had been taking 200 mg of Zoloft daily for the past month. (Tr. 777). He also indicated that he still had back pain which sometimes causes his legs to give out and requested a cane. (Tr. 780). He had not attended physical therapy but was now willing to try. (*Id.*). McKinney also reported that he would be willing to try preventative therapy for his gout instead of only following a recommended diet. (*Id.*). McKinney's wife stated that McKinney had less irritable behavior on Zoloft but still had

episodes of "nitpicking" on their children and getting upset over minor issues. (Tr. 777). Dr. Schuler continued McKinney on Zoloft 200 mg daily, and prescribed him a cane. (Tr. 780-82).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewing Opinion Evidence

On November 2, 2023, at the initial level, state agency reviewing physician, Elizabeth Das, M.D. opined that McKinney had exertional limitations of occasionally lifting or carrying 20 pounds, frequently lifting 10 pounds, and standing, walking, or sitting for no more than 6 hours in an 8-hour workday. (Tr. 84). Dr. Das provided postural limitations of occasionally climbing stairs or ramps, never climbing ladders, ropes, or scaffolds, and occasionally stooping, kneeling, crouching, and crawling. (*Id.*). Dr. Das also opined that McKinney must avoid all exposure to hazardous machinery or heights. (Tr. 85). On March 21, 2024, J. V. Corcoran, M.D., affirmed all of Dr. Das' restrictions, but further restricted McKinney to frequent balancing, and occasional pushing and pulling of the left lower extremity. (Tr. 97-98). Dr. Corcoran included this additional restriction due to updated findings from the consultative examiner. (Tr. 98).

On November 5, 2023, at the initial level, state agency reviewing psychiatrist Jennifer Kutys, Psy.D., opined that McKinney can understand and carry out simple instructions, but the instructions must be written. (Tr. 85). Additionally, McKinney needs occasional supervisory checks to ensure he is working to complete tasks. (*Id.*). Dr. Kutys also opined that McKinney will need occasional flexibility with production quotas and meeting deadlines. (*Id.*). Regarding concentration and persistence limitations, Dr. Kutys opined that McKinney is moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, in working in coordination with or in proximity to others without being distracted by them, in completing a workday and workweek without interruption, and in performing at a

consistent pace without an unreasonable number and length of rest periods. (Tr. 86). Dr. Kutys also found that McKinney is moderately limited in his ability to set realistic goals or make plans independently of others. (*Id.*). Dr. Kutys opined that McKinney can adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent basis; major changes would need to be introduced in advance and then gradually phased in to allow him time to adjust to new expectations; he retained the ability to perform work activity that includes a wide range of simple, repetitive tasks involving superficial contact with others in a setting free of strict production standards or fast pace. (Tr. 86-87). On January 17, 2024, Jennifer Swain, Psy.D. affirmed Dr. Kuty's findings. (Tr. 100).

### 2. Consultative Examination Opinion Evidence

On September 6, 2022, McKinney underwent a consultative examination by Sudhir Dubey, Psy.D., at Advanced Injury Management. (Tr. 450-56). McKinney reported that he was able to take care of himself but needed help managing money and filling out paperwork due to his cognitive and intellectual issues. (Tr. 452). On a mental status examination, McKinney was able to recall five digits forward and two digits backwards, his performance on serial sevens was limited, he could only recall one out of three objects after a five-minute delay, and he was unable to do simple multiplication. (Tr. 453). Dr. Dubey assessed McKinney with borderline intellectual functioning and opined that McKinney could understand, remember, and carry out simple, one-step instructions independently but would need supervision to complete multi-step instructions. (Tr. 454). McKinney was also able to maintain persistence and pace to carry out simple tasks on his own and would be able to complete multi-step tasks on his own, once the task is learned. (Tr. 455). Dr. Dubey opined that McKinney would have no difficulties in dealing with work

supervision or coworkers but he may have some difficulties in dealing with work pressure. (Tr. 455-56).

McKinney had a consultative examination report completed with Casey Norris, D.O., on September 17, 2022. (Tr. 459). McKinney reported back pain and gout flares in his left great toe, two times per week. (*Id.*). On examination, Dr. Norris noted a decreased range of motion in the lumbar spine, a positive straight leg raise test on his left leg, and normal strength, gait, and balance. (Tr. 462-63). Dr. Norris also noted mild joint swelling and erythema with tenderness of the first left MTP. (Tr. 462). X-ray imaging taken during the consultative examination showed severe joint space narrowing and severe spondylosis at L5-S1. (Tr. 463). Dr. Norris opined that McKinney could walk four or five hours of an eight-hour workday and stand five hours in an eight-hour workday. (*Id.*). Further, McKinney could lift 20 pounds frequently and 30 pounds occasionally. (*Id.*). Dr. Norris also found that McKinney could process information when it is presented at an eighth-grade level. (*Id.*).

McKinney was seen by Mark Weaver, M.D., on October 5, 2023, for a consultative examination. (Tr. 541). McKinney reported that he had constant lower back pain and aching, and had gout attacks which result in pain, swelling, and stiffness in his great toe once or twice a week. (*Id.*). McKinney denied any treatment or physical therapy for these issues. (*Id.*). McKinney also denied using any ambulatory aid. (*Id.*). Further, McKinney reported having obstructive sleep apnea. (Tr. 542). Dr. Weaver found that McKinney's lower back and gout problems, along with obstructive sleep apnea, would "probably" limit his performance in physical activities including sustained sitting, walking, standing, climbing, squatting, stooping, crouching, crawling, lifting, and carrying, along with limited ability to follow directions. (Tr.

545-46). However, McKinney could perform activities involving handling objects, speaking, and hearing. (Tr. 546).

In an October 16, 2023, consultative examination, Melissa Lanza, Ph.D., found that McKinney was treated for ADHD in his youth, was identified in his educational records as having specific learning disorders in reading, written expression, and math, and had a history of childhood abuse with trauma-related flashbacks, hypervigilance, and panic attacks. (Tr. 558). Dr. Lanza found that McKinney's symptoms were consistent with PTSD, Unspecified Anxiety Disorder, ADHD, and Specific Learning Disorder. (*Id.*). Dr. Lanza opined that McKinney had limitations to his memory, finding that it was lower than expected for his age, especially in short term memory, had no limitations in maintaining attention and concentration when not experiencing mental health symptoms, such as PTSD-induced panic attacks, had limitations to responding appropriately to supervisors, coworkers, and the public in a work setting, and had limitations to responding appropriately to normal work pressures in a competitive work setting. (Tr. 559).

On March 16, 2024, McKinney underwent a consultative examination with Jaclyn Bowe, D.O. (Tr. 636). Dr. Bowe observed that McKinney had decreased sensation in the left lower extremity, had a decreased strength of 4/5 of left hip flexion, left knee extension, and left plantar flexion, and had positive straight leg test. (Tr. 639). Dr. Bowe found that McKinney was able to walk with a symmetric and steady gait for a very short distance and could walk on his toes and heels, with difficulty in his left foot. (*Id.*). Dr. Bowe opined that McKinney could sit for eight hours in an eight-hour workday, stand for two hours in an eight-hour workday, and walk for zero hours in an eight-hour workday. (*Id.*). Further, Dr. Bowe opined that McKinney could lift and

carry 10 pounds, but only for very short distances, and he can manipulate, handle and reach continuously, but could not stoop, crouch, or kneel continuously. (*Id.*).

**D. Administrative Hearing Evidence**

McKinney testified before an ALJ on September 23, 2024. (Tr. 42-55). McKinney testified that he had an eighth-grade education and does not have a GED. (Tr. 42). McKinney has a driver's license. (Tr. 49). He last worked assembling bus seats where he stood and walked all day, as well as lifted 50 pounds or more on a regular basis. (Tr. 42-43). He testified that the heaviest weight he had to lift was 60 or 70 pounds. (Tr. 43).

As to McKinney's physical diagnoses, he testified that he believes he has a pinched nerve that sends a sharp numbing sensation down his left leg and causes the back of his leg and heel to be numb. (*Id.*). As a result, sometimes his leg gives out. (Tr. 44). McKinney also testified that he has gout in his feet and great toe. (*Id.*). He reported that gout flare ups occur around three or more times a week. (*Id.*). McKinney stated he has obstructive sleep apnea, which he treats with a CPAP. (*Id.*). McKinney noted that he had limited success with CPAP treatment because he has anxiety about putting the mask on at night. (*Id.*). McKinney testified that he had no other diagnoses that affect his ability to work. (*Id.*).

McKinney was asked about the physical issues that affect his daily life and ability to work. He stated that he his feet are constantly sore which makes it difficult to climb 10 or 15 stairs without a gout flare up. (Tr. 44-45). When McKinney has a gout flare up, he testified that it is difficult to walk. (Tr. 49). He also cannot sit comfortably for a long time without back pain. (Tr. 45). Although he can drive, McKinney stated that the drive must be a short trip. (Tr. 49). McKinney testified that he is only able to do a limited number of chores and gave the example that if he were vacuuming, he would need a break after five minutes. (Tr. 50). He stated that his

issues cause him to need to lay down or take naps two or three times a day and he treats his symptoms with conservative treatment at home, such as a heating pad and massage gun. (Tr. 51). McKinney treats his gout with orthopedic inserts in his shoes. (Tr. 52-53). He also stated that he will be starting physical therapy to treat his back. (Tr. 49).

Regarding McKinney's mental health issues, he testified that these issues affect his daily life. (Tr. 45). He stated that it is difficult to get along with his family or be around more than one or two people at a time (Tr. 45-46). As a result, he cannot interact with the majority of his family and has difficulty going in public (Tr. 46). He stated that his inability to interact with his family makes him depressed and puts him into a panic. (Tr. 47). McKinney also testified that when he is around more than three people, he gets agitated and snappy, and his anxiety worsens. (Tr. 46). McKinney stated that nightmares and PTSD impact his daily life. (Tr. 47). He stated he had a rough childhood, involving abuse from his father, that he has nightmares about it, causing him to have "big problems with stuff like that." (*Id.*). Based on his mental health issues, McKinney testified that he had verbal confrontations with coworkers in the past, but the altercations never turned physical. (*Id.*).

McKinney also testified that he has learning difficulties that make it difficult to perform basic reading or writing. (Tr. 47-48). He stated he has difficulty spelling and comprehending what he is reading. (Tr. 48). McKinney also testified that he has limited ability to do simple math, such as adding and subtracting. (Tr. 47).

After McKinney's testimony concluded, VE Kathleen Byrnes testified. (Tr. 55-71). The VE testified that McKinney last worked as an assembler production, DOT 706.687-010, light and unskilled, but performed at heavy. (Tr. 56).

For her first hypothetical, the ALJ asked the VE to consider an individual of the same age, educational background, and work experience as McKinney who was capable of performing light work with the following limitations: no climbing of ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasional balancing, stooping, crouching or kneeling; no crawling; no work in unprotected heights; no work around hazardous machinery; no requirement for commercial driving; no bilateral operation of foot controls; occasional bilateral overhead reach; avoid concentrated exposure to vibration; avoid concentrated exposure to extreme cold, such as working in a freezer, heat, standing over a stove, humidity, wetness, pulmonary irritants; simple routine work; occasional decision making; occasional changes in the work setting; structured and predictable work environment; no work with the general public as part of any routine job duties; only occasional simple and routine interaction with coworkers and supervisors; no tandem routine job tasks; instructions are verbal and demonstration in nature that does not involve resolving complaints or persuading others; no supervisory responsibilities; no major changes in the work environment or routine; occasional minor changes in the work setting; no fast-paced production assembly line work or work where the machine is setting the pace; and no strict hourly production requirements. (Tr. 56-58). The VE opined that such an individual could work as a merchandise marker, DOT 209.587-034, light and unskilled, with 163,000 jobs nationally; as a routing clerk, DOT 222.687-022, light and unskilled, with 123,000 jobs nationally; and as a small product assembler, DOT 706.84-022, light and unskilled, with 20,000 jobs nationally.

For her second hypothetical, the ALJ asked the VE to consider all the same circumstances of the first hypothetical, except that this individual would have the further limitations of standing or walking for one hour at a time for a total of four hours; and sitting for

one hour at a time for a total of six hours. (Tr. 59). The VE opined that such an individual could work the same jobs as the first hypothetical, but reduced the number of jobs nationally in each job by one half to account for the employers that do not have a workstation to accommodate a stand/sit option. (Tr. 59-60).

For her third hypothetical, the ALJ asked the VE to consider all the same circumstances of the first hypothetical, except the individual can only perform at a sedentary exertion level. (Tr. 60). The VE opined that the individual could work as a document preparer, DOT 249.587-018, sedentary and unskilled, estimated 14,100 jobs nationally; surveillance system monitor, DOT 379.367-010, sedentary and unskilled, estimated 3,000 jobs nationally; and address clerk, DOT 209.587-010, sedentary and unskilled, estimated 2,000 jobs nationally. (Tr. 60). Upon the ALJ's request, the VE supplied additional sedentary jobs, including sorter, DOT 521.687-086, sedentary and unskilled, estimated 1,900 jobs nationally; table worker, DOT 739.687-182, sedentary and unskilled, estimated 1,200 jobs nationally; and tube operator, DOT 239.687-014, sedentary and unskilled, estimated 780 jobs nationally (Tr. 61).

For her fourth hypothetical, the ALJ asked the VE to consider all the same circumstances as the third hypothetical except that the individual would have the further limitations of standing or walking for one hour at a time for a total of six hours; and sitting for one hour at a time for a total of six hours. (Tr. 62). The VE opined that the individual could work the same jobs as hypothetical three, but the estimated jobs in the national economy would be reduced by one half to account for the employers that do not have a workstation to accommodate a stand/sit option. (*Id.*).

For her fifth hypothetical, the ALJ asked the VE to consider an individual of the same age, educational background, and work experience as McKinney who has a marked level of

social interaction which requires an individual to work in isolation and only communicates with supervisors at shift change. (Tr. 63). The VE opined that such an individual is not capable of work in a competitive environment. (*Id.*).

For her sixth hypothetical, the ALJ asked the VE to consider an individual of the same age, educational background, and work experience as McKinney who would be mentally or physically off-task an additional 20 percent beyond typical rest or break periods, 3 out of 5 days of the week (*Id.*). The VE opined that such an individual would not be capable of sustained competitive employment. (Tr. 64). The VE further opined that employers can only typically tolerate up to 10 percent of the workday off-task. (*Id.*)

The ALJ then asked, for an individual with the same age, educational background, and work experience as McKinney, how much an employer would tolerate unexcused absences, coming in late, leaving work early, and calling out for an entire shift before the individual's employment would be at risk. (*Id.*). The VE opined that employers typically tolerate one or two absences a month during a short probationary period of about thirty to sixty days. (*Id.*). After the probationary period, an employer will typically tolerate anywhere between six to eight absences a year. (*Id.*).

McKinney's attorney proceeded to examine the VE. (Tr. 65). McKinney's attorney asked the VE, when considering the circumstances in hypotheticals one through four, would the individual be able to obtain competitive employment if the individual needed supervisory checks one third of the day; if one day a week, the individual will need flexibility in a third of the work day to reach production quotas or deadlines; or if the individual was only capable of SVP l jobs. (Tr. 65-66). The VE testified that any of the hypothetical individuals identified in hypothetical

one through four would not be able to obtain competitive employment if the individual had even one of the further limitations that McKinney's attorney added. (*Id.*).

## IV. The ALJ's Decision

In her decision dated October 23, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2. The claimant has not engaged in substantial gainful activity since December 16, 2022, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: lumbar spinal stenosis with radiculopathy; osteoarthritis; obesity; obstructive sleep apnea; anxiety; depression; and posttraumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand or walk for 1 hour at a time and for a total of 4 hours and can sit for 1 hours at a time for a total of 6 hours. Furthermore, he can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, crouch, or kneel; and never [sic]. He should have no work around unprotected heights or hazardous machinery and no commercial driving. He should have no bilateral operation of foot controls. He can occasionally reach overhead bilaterally. He should avoid concentrated exposure to vibration and should have no concentrated exposure to extreme heat, extreme cold, humidity, wetness, and pulmonary irritants. Mentally, the claimant can perform simple, routine tasks, with occasional decision-making, and occasional changes in the work setting. He should have no work with the general public as part of routine jobs duties, and occasional interaction with coworkers or supervisors, but no tandem routine jobs tasks. Instructions should be verbal and demonstration in nature, and should not involve resolving complaints, persuading others, or supervision of others. The claimant cannot perform work on a fast-paced production assembly line work or work where a machine is setting the pace, and no strict hourly production requirements, with work goals measured only at the end of the day.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 19, 1979, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 16, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-29).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, a court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

McKinney raises two issues for this Court's review:

1. The ALJ erred by failing to draw a logical bridge between the evidence and the rejection of many disabling mental limitations related to supervision, learning new tasks, and interaction proposed by the medical opinion evidence.

2. The ALJ erred by failing to draw a logical bridge between Plaintiff's RFC and the evidence and instead based Plaintiff's RFC on her own lay opinion.

(ECF Doc. 13, p. 1).

### A. The ALJ properly drew a logical bridge between the evidence and the rejection of limitations to supervision, learning new tasks, and interacting with others in her RFC determination.

In McKinney's first issue, he argues that the ALJ improperly rejected limitations proposed by the medical opinions without analyzing whether each opinion was persuasive. (ECF Doc. 13, p. 5). Specifically, McKinney argues that the ALJ failed to draw an accurate and logical bridge when she rejected or did not account for the specific limitations of (1) occasional direct

supervision during the workday; (2) occasional flexibility with production quotas and meeting deadlines; and (3) moderate limitation of McKinney's ability to interact with others in an appropriate manner. (*Id.* at pp. 5-12). The Commissioner argues that the ALJ supported the limitations in the RFC with substantial evidence. (ECF Doc. 11, pp. 16-19).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.*, No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*). When evaluating a medical opinion, ALJs are not required to articulate how they considered each medical opinion or prior administrative medical finding from one medical source individually and may evaluate the opinion on a source level. 20 C.F.R. § 404.1520c(c)(1).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources

and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.*, No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017)., 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.*, 2022 WL 3445856, at *3, *citing Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

When adopting state agency psychologist's opinions, "there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). This is because an ALJ, not a state agency physician, "is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

This Court will not uphold a decision when the ALJ's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

For the reasons that follow, I find that the ALJ properly evaluated the medical opinions and supported her RFC determination with substantial evidence.

**1. Occasional supervision**

Turning to McKinney's first cited limitation, Drs. Kutys and Swain opined, "[McKinney] would need occasional supervisory checks to ensure [he] is working to complete tasks." (Tr. 85, 99). In finding this limitation unpersuasive, the ALJ properly evaluated the medical evidence, supported her conclusion with substantial evidence, and created a logical bridge between the evidence and the result.

The ALJ found the medical opinions of the state agency psychologists partially persuasive based on a robust supportability and consistency analysis. Regarding supportability, the ALJ found that the "B criteria ratings are well supported by the cited evidence . . . ." (Tr. 27). The ALJ then cites to McKinney's individualized education plan from high school, and consultative psychological examinations by Dr. Dubey and Dr. Lanza, which the state agency reviewers had also cited in their opinions. (Tr. 27 *citing to* 95-96, 354-456, 553-59). Turning to consistency, the ALJ found that the opinion was inconsistent with the record and McKinney's reported work history. (Tr. 27-28). The ALJ noted that the record consisted of conservative and intermittent treatment and McKinney reported good control over his anxiety in October 2023. (Tr. 26). His wife further reported decreased irritable behavior with medication in July 2024, albeit with episodes of "nitpicking" on the children and getting upset about minor issues. (Tr. 26, 28 *citing to* 629, 631, 777). In finding that the opinion was inconsistent with McKinney's work

history, the ALJ cited to two consultative examinations where McKinney reported long term prior work, but did not mention any restrictions relating to his psychological conditions. (Tr. 27-28 *citing to* 90, 95-96).

By weighing the consistency and supportability of the medical opinions, and providing substantial evidence to support her determination, the ALJ provided sufficient rationale for this Court to review and properly built a logical bridge between the evidence and the RFC. McKinney's numerous citations to the record that he claims support his alternative conclusion are immaterial. This Court cannot reweigh the evidence and the ALJ's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Since the ALJ's rejection of this limitation was supported by substantial evidence and followed agency regulations, I do not recommend remand on this basis.

**2. Occasional flexibility with production quotas and meeting deadlines.**

State agency consultants Drs. Kutys and Swain further opined, "[d]uring periods of increased symptomology, [McKinney] will need occasional flexibility with production quotas and meeting deadlines." (Tr. 85).

Contrary to McKinney's assertion, the ALJ did incorporate this limitation into the RFC. The ALJ included in her RFC that McKinney could not "perform work on a fast-paced production assembly line work or work where a machine is setting the pace, and no strict hourly production requirements, with work goals measured only at the end of the day." (Tr. 21-22). Although these limitations are not exact to Drs. Kutys and Swain's opinions, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe*, 342 F. App'x at 157 (6th Cir. 2009). Here, the ALJ properly considered

the medical opinions of Drs. Kutys and Swain, which she found to be partially persuasive, and determined the RFC accordingly. Thus, this argument is likewise rejected.

**3. Limitation of McKinney's ability to interact with others.**

Finally, McKinney argues that the ALJ failed to build a logical bridge between the evidence and the denial of the state agency reviewing psychologists' opinions, which he groups together as his "ability to interact with others in an appropriate manner. (ECF Doc. 8, p. 10).

Specifically, the state agency reviewing psychologists opined,

> [McKinney] can interact with the public and coworkers on a superficial basis for work-related tasks that involve straightforward exchanges of information, but do not involve resolving complaints or persuading others.

(Tr. 86, 100). Having found this opinion "partially persuasive," the ALJ accommodated for their opinions in the RFC, finding:

> He should have no work with the general public as part of routine jobs duties, and occasional interaction with coworkers or supervisors, but no tandem routine jobs tasks. Instructions . . . should not involve resolving complaints, persuading others, or supervision of others.

(Tr. 21). The ALJ properly evaluated this medical opinion in terms of supportability and consistency, according to agency regulations. Although the ALJ did not adopt the limitation from the medical opinion to the RFC verbatim, that is not required. *Rudd*, 531 F. App'x at 728.

The ALJ also supported her modifications to the state agency psychological physicians' opined limitation with substantial evidence. When finding the state agency psychological physicians' medical opinion "partially persuasive," the ALJ cited to two consultative examinations. (Tr. 27). In the first cited consultative examination, Dr. Dubey reported that McKinney did not have difficulties with work supervision or coworkers. (Tr. 455). In the second consultative examination by Dr. Lanza, McKinney reported that he previously argued with a supervisor and grabbed a coworker. (Tr. 559).

Therefore, the ALJ's conclusion was supported by substantial evidence, and she drew an accurate and logical bridge between that evidence and her conclusion.

I therefore do not recommend remand on this issue.

**B. The ALJ did not rely on her own lay opinion when forming the RFC.**

Turning to the second issue, McKinney argues that certain physical and mental limitations within the RFC cannot be traced back to a medical opinion. (ECF Doc. 13, pp. 12, 19). McKinney contends that since none of these limitations came from a medical opinion, the ALJ impermissibly interpreted the raw medical data to determine McKinney's functional capabilities. (*Id.*). Additionally, McKinney argues that there was a critical body of objective evidence not accounted for by the medical opinions in the file. (*Id.* at 12, 14, 20). Both defects, McKinney argues, created the "duty" for the ALJ to develop the record by obtaining additional medical evidence in order to properly make an RFC determination. (*Id.* at 16). Since the ALJ did not fulfill that duty, she failed to draw an accurate and logical bridge from the evidence to her conclusions. (*Id.* at 12). To support his argument, McKinney cites to the *Deskin/Kiszys* standard from two non-binding cases within this District. (ECF Doc. 13, p. 14, (citing *Deskin v. Comm'r of Soc. Sec*., 605 F. Supp. 2d 908 (N.D. Ohio 2008); *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011))).

The Commissioner responds that a heightened duty to develop the record does not exist in the circumstances of this case, and even if such circumstances existed, McKinney does not meet the requirements for the heightened duty to apply. (ECF Doc. 11, pp. 11-14).

**1. The *Deskin*/*Kizys* standard is inconsistent with Sixth Circuit precedent.**

As an initial matter, the ALJ had no heightened duty to develop the record and the *Deskin*/*Kizys* standard does not apply. The Sixth Circuit requires that an ALJ must act "as an

examiner charged with developing the facts" and must ensure that every claimant receives a full and fair hearing. *Lashley v. Sec. of Health & Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983). Despite this requirement, in a typical case, an ALJ does not have a duty to develop the record. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) ("[W]hile the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant.").

Only in special circumstances where claimants are (1) unrepresented, (2) are unfamiliar with hearing procedures, and (3) are incapable of presenting an effective case does the Sixth Circuit require that the ALJ "exercise a heightened level of care" in developing the record. *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). Here, McKinney was represented by counsel throughout all relevant times during this case, thus not triggering the heightened duty. (Tr. 37, 103-106).

Nevertheless, McKinney argues that under the *Deskin/Kizys* standard a heightened duty exists requiring the ALJ to develop the record. *See Deskin v. Comm'r of Soc. Sec*., 605 F. Supp. 2d 908 (N.D. Ohio 2008); *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011). The *Deskin*/*Kizys* standard establishes a "narrow rule" requiring remand to further develop the record when an ALJ "makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Kizys*, 2011 WL 5024866, at *2.

Subsequent courts within this District have repeatedly declined to follow this standard. As one court explained:

> *Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law[.] By requiring an ALJ to secure a medical opinion whenever the record does not contain such an opinion, subject to only limited

exceptions, *Deskin* places a higher burden on the ALJ than the Sixth Circuit does. *Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023); *see also Kopcial v. Kijakazi*, No. 1:23-CV-00201, 2024 WL 1131059, at *6 (N.D. Ohio Mar. 15, 2024) (collecting cases) ("*Deskin* has received negative treatment or been distinguished by no less than twenty-six other decisions from district courts within this Circuit.").

Courts within the District have determined that an ALJ need not "obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence." *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *4 (N.D. Ohio Dec. 30, 2020) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009)). Sixth Circuit precedent is consistent with the approach in *Van Pelt*. The Sixth Circuit has repeatedly "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).

I therefore reject McKinney's argument that the ALJ was required to obtain new medical opinion evidence.

**2. Substantial evidence supports the ALJ's RFC determination.**

Here, the ALJ's determination was supported by substantial evidence. Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). With this standard in mind, the physical and mental RFC determinations will be taken in turn.

**a. Substantial evidence supports the ALJ's physical limitations set forth in the RFC.**

McKinney argues that many of the ALJ's RFC physical limitations were not supported by an opinion from a medical professional; therefore, the ALJ impermissibly interpreted raw medical data, and the RFC was not supported by substantial evidence. (ECF Doc. 13, p. 12). Specifically, McKinney argues the following RFC limitations are unsupported: (1) standing or walking for one hour at a time; (2) sitting for one hour at a time; (3) never climbing ladders, ropes, or scaffolds; (4) never operating foot controls bilaterally; (5) occasionally reaching overhead bilaterally; and (6) never having concentrated exposure to vibration, extreme heat, extreme cold, humidity, wetness, and pulmonary irritants. (*Id.* at 12-13).

An RFC determination does not lack substantial evidence simply because no medical opinion makes the same exact findings. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x. 435, 442-43 (6th Cir. 2017). This is because "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). An RFC is an "administrative finding, and the final responsibility for determining an individual's RFC is reserved to the Commissioner." *Shepard*, 705 Fed. App'x at 442. Therefore, "to require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at 728. Courts have declined to find fault when the ALJ "find[s] more restrictions than the state agency reviewers opined[.]" *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022).

When an ALJ veers from the medical opinions, they also do not necessarily interpret raw medical data. Although an ALJ may not "play doctor and make their own independent medical findings," an "ALJ does not interpret raw medical data where it has already been read and interpreted by a medical professional." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x. 181, 194 (6th Cir. 2009); *see Kleinhans v. Kijakazi*, No. 3:23-CV-00173, 2023 WL 7923901, at *8 (N.D. Ohio Sept. 28, 2023) (citing *Rudd*, 531 F. App'x at 727). The Sixth Circuit has found that it is within an ALJ's ability to interpret medical data from an x-ray where the relevant raw data has already been "read and interpreted by a radiologist." *Rudd*, 531 F. App'x at 726-27. Additionally, courts have found that an ALJ does not interpret raw medical data when evaluating treatment notes. *Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634 at *5 (N.D. Ohio Nov. 15, 2023).

Here, the ALJ made the following physical RFC determination:

> the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand or walk for 1 hour at a time and for a total of 4 hours and can sit for 1 hours at a time for a total of 6 hours. Furthermore, he can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, crouch, or kneel; and never [sic]. He should have no work around unprotected heights or hazardous machinery and no commercial driving. He should have no bilateral operation foot controls. He can occasionally reach overhead bilaterally. He should avoid concentrated exposure to vibration and should have no concentrated exposure to extreme heat, extreme cold, humidity, wetness, and pulmonary irritants.

(Tr. 21-22).

First, McKinney is incorrect that the limitation of never climbing ladders, ropes, or scaffolds, was not set forth by a medical professional. McKinney is similarly incorrect in his assertion that the ALJ did not relate this limitation to a medical opinion. Drs. Das and Corcoran directly opined to this limitation and the ALJ found these opinions to be partially persuasive. (Tr. 27 *citing to* Tr. 98). Therefore, this limitation is supported by substantial evidence.

The “raw medical data” that McKinney contends the ALJ impermissibly considered when determining the physical RFC were treatment notes, the objective findings reviewed by consultative examiners, and straight leg tests. (Tr. 92, 462, 469, 636, 639). However, a review of the medical records reveals that, contrary to McKinney’s assertion, they were “read and interpreted by a medical professional.” *Simpson* 344 F. App’x. at 194; (Tr. 462, 469, 636, 639). Thus, the ALJ did not impermissibly interpret raw medical data.

The question then turns to whether substantial evidence supports the ALJ’s RFC determination. In deciding the physical RFC, the ALJ painstakingly went through the opinions of two state agency reviewing physicians, three consultative examinations, numerous treatment notes, and objective findings, noting an overall conservative and intermittent treatment record. (*See* Tr. 22-28). Although each limitation within the ALJ’s RFC determination is not explicitly found in a medical opinion, there is no such requirement. An RFC determination is an administrative finding, and it is the responsibility of the ALJ, not any individual physician, to determine the specific limitations. *Shepard*, 705 Fed. App’x at 442.

Evidence supports each of the physical limitations found in the RFC. Regarding McKinney’s ability to stand, walk, and sit, the ALJ found three medical opinions “partially persuasive” that address this limitation. (Tr. 27 *citing to* 84, 97). Drs. Das and Corcoran opined that McKinney could only stand, sit, and walk six hours per day. (Tr. 84, 97). Regarding the RFC limitation to bilateral foot controls, Dr. Cocoran limited McKinney to occasional pushing and pulling of the left lower extremity (Tr. 97), and the ALJ found this medical opinion “partially persuasive.”. (Tr. 27-28 *citing to* 97-98, 462-63). The ALJ also finds “partially” persuasive medical opinions discussing McKinney’s limiting back conditions, which provides substantial

evidence for the "occasionally reach overhead bilaterally" limitation. (Tr. 27-28 *citing to* 84, 97-98, 463).

Although no medical opinion accounts for the RFC limitation to "exposure to vibration, extreme heat, extreme cold, humidity, wetness, and pulmonary irritants," an ALJ does not err when an RFC determination is more restrictive than any opined limitation. *Laney*, 2022 WL 2176539, at *7. Each limitation that McKinney takes issue with is either equal to or more restrictive than the limitations contained within medical opinions that the ALJ found persuasive. (Tr. 21-22 *compared with* 84, 97-98, 462-63). It follows that the ALJ did not err in finding McKinney more restricted during work than any persuasive medical opinion opines. Accordingly, the physical limitations listed in the RFC are supported by substantial evidence and the ALJ created an accurate and logical bridge from the evidence to the RFC.

**b. Substantial evidence supports the ALJ's mental limitations set forth in the RFC.**

McKinney raises a similar argument regarding the mental limitations within the RFC. (ECF Doc. 13, p. 19). McKinney contends that the ALJ interpreted raw medical data when determining the following RFC limitations: (1) never working with the general public as part of routine jobs duties; (2) occasionally interacting with coworkers or supervisors; no tandem routine jobs tasks; (3) no fast-paced production assembly line work or work where a machine is setting the pace, and no strict hourly production requirements, with work goals measured only at the end of the day; and (4) instructions should be verbal and demonstration in nature, and should not involve resolving complaints, persuading others, or supervision of others. (*Id.*). This argument too is not well taken.

McKinney asserts that the ALJ interpreted raw medical data when she evaluated relevant treatment notes (ECF Doc. 13, pp. 19-21) but, as written above, this review does not constitute

interpretation of raw medical data. *See Winans*, No. 5:22-CV-01793, 2023 WL 7622634 at *5. Thus, as discussed above, the ALJ did not err in this regard. Therefore, if the ALJ's RFC determination was supported by substantial evidence, it must stand. I find that it was.

Here, each limitation is supported by the consultative examination by Dr. Lanza and the medical opinions of the state agency psychological physicians. The ALJ found these medical opinions "partially persuasive." (Tr. 27). Regarding the first two cited limitations, Dr. Lanza opined that McKinney's ability to respond appropriately to supervisors, coworkers, and the public in a work setting and to respond appropriately to normal work pressures in a competitive work setting "appeared limited." (Tr. 559). Similarly, Dr. Lanza found that McKinney "appeared limited" in the area of attention, concentration, persistence, and pace. (*Id.*). The ALJ found that Dr. Lanza's opinions were supported by the objective findings of her examination, the other treatment records, and McKinney's academic background. (Tr. 27). This is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 587 U.S. 97, 103 (2019) (citation omitted).

Finally, the limitation that instructions be "verbal and demonstration in nature, and should not involve resolving complaints, persuading others, or supervision of others," was supported by the medical opinions of the state agency reviewing psychologists and McKinney's own testimony. (Tr. 23, 27-28). The state agency psychological physicians opined that McKinney could only engage in "superficial" communications that do not involve "resolving complaints or persuading others." (Tr. 86, 100). The ALJ determined the state agency psychological physicians' opinion in this area was "well supported" with the evidence. (Tr. 27). Regarding the "verbal" requirement of the limitation to instructions, the ALJ noted in her decision that McKinney testified he had difficulty with reading. (Tr. 23).

While none of these limitations are found verbatim in the medical evidence, an ALJ need not copy a physician's opinion exactly. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Instead, the ALJ properly combined the medical opinions of Dr. Lanza and the state agency psychological physicians, along with the medical and non-medical evidence to make her RFC determination. In so doing, the ALJ supported her decision with substantial evidence and created an accurate and logical bridge from the evidence to the RFC, allowing subsequent reviewers the ability to understand her reasoning.

McKinney's further argument that the RFC does not account for clinical findings, such as testing which showed McKinney struggled to read words over one syllable or could not perform simple multiplication fairs no better. These tests were discussed by the ALJ in her decision and in the medical opinions she cites. (Tr. 25, 27 *citing to* 443, 557). As a result, this argument is simply asking this Court to reweigh the evidence, which it cannot do. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). I therefore do not recommend remand on this issue.

**VII. Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying McKinney's application for DIB be affirmed.

Dated: August 14, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).